And we definitely designated them as so. I think we were surprised as well that the cases weren't heard together and assumed that the court, perhaps mistakenly, that the court did so for a reason. And if that was the case, I apologize for that. Well, it just seems like there was a massive lack of communication all along the line. And I've already asked our clerk's personnel about it. And I'm not blaming anybody, but it is extremely inefficient for us to have the two cases separate when Judge Ezra issued two opinions essentially at the same time. And involving the same facts. Right. I completely appreciate your concern. Right. Okay. Excuse me. Sure. In Burlington Northern, the Supreme Court held that conduct is retaliatory if it well might dissuade a reasonable worker from engaging in protected activity. It is impossible to reconcile that standard with the district court's holding in this case. According to the district court, news of a 50% pay cut delivered by a high-ranking corporate officer was insufficient as a matter of law for a jury to find retaliatory conduct. Whether viewed as a final decision or as a credible threat, news of such a significant pay cut is sufficient as a matter of law under the Burlington Northern standard. Under Title VII, there are three elements to a retaliation claim. The first being protected activity. The second being adverse action or what I'm calling retaliatory conduct. And the third is causation, a link between the two. I'll start, if I may, with the element of retaliatory conduct because that was the sole basis for the district court's decision here. In Burlington Northern, the Supreme Court emphasized that retaliatory conduct covers more than ultimate employment decisions, as they referred to it. It covers a broader array of conduct. So, for example, in Burlington Northern, the standard covered removing an employee from forklift duties and putting her in other positions that were within her job description. And it also included putting her on unpaid administrative leave and then rectifying the situation after the fact. Just going back a minute, excuse me. I don't mean to interrupt your train of thought, but on the question of the threat of a pay cut, Judge Ezra cited several authorities. Admittedly, none of them are Fifth Circuit authorities, but do you disagree with the authorities that he cited as being a legitimate indication that threats of pay cut don't constitute materially adverse employment actions? I think all of those cases are distinguishable, Your Honor. They're distinguishable on the law. In each one of those cases, the retaliatory conduct, the proposed pay cut, was viewed through the lens of terms and conditions of employment. It was viewed through that lens, not the Burlington Northern standard. So, for example, in Williams, there were retaliation and discrimination claims, but the proposed pay cut was only analyzed with respect to the substantive discrimination claims. And, of course, the standard there is far more sufficient or far more onerous for the employee. Mitchell was a case that was decided before Burlington Northern, and again, it was analyzed substantively under the ADEA as to whether or not that constituted discrimination under the terms and conditions standard. Brock is a slightly different case. It was a salary reduction under the anti-retaliation provision of the FLSA. But in that case, the court didn't discuss the Burlington Northern standard. It simply cited to Mitchell without appreciating the distinction. And Scott was a case under the anti-retaliation provision of the False Claims Act. And the anti-retaliation provision there, which is available at 31 U.S.C., 3730H1, speaks of retaliation that affects, and I quote, the terms and conditions of employment. So every one of those cases is distinguishable because it analyzed it under a more onerous standard than Burlington Northern. I — Is there contrary authority that indicates that a threat of a pay cut would be a materially adverse employment action? There is, Your Honor. In fact, this circuit, and I hate to rely on a non-published decision, but for example, in the Fallon case, this circuit held that threats that were far vaguer could constitute retaliation under the Burlington Northern standard. Probably that's why it's unpublished. Perhaps. But it certainly persuaded three of your colleagues. And here's the threat. You'll never have anyone in this post office stand up for you if you continue to file these charges. I'll show you what you're up against. That is a far vaguer threat and has far less significance than a 50 percent pay cut. And if I could give you an example, because I think it's helpful here. Take, for example, a company. They receive a grand jury. They are aware that they are the subject of a grand jury investigation. An employee of this company receives a subpoena to testify. And shortly before showing up at the district court to testify, a vice president takes that employee aside and says, if you tell the truth, we'll cut your pay by half. I don't think the U.S. Attorney's Office has to wait for the first 50 percent pay cut before they can charge that company with witness tampering. And the standards are very similar. Under 18 U.S.C. 1512, it's whether or not you've corruptly persuaded somebody to change their testimony. And here, it's whether or not you've dissuaded a reasonable worker or might well. There's, in both cases, it's a functional test. It's whether or not you are attempting to influence somebody from engaging in protected conduct. Let me just say that, you know, you may well be right about that, but what we have here in this particular case, and I'm not trying to defend anything that Judge Ezra wrote in particular, but this case is a tissue of, I wanted to say, improbabilities, but that's not exactly the right word. We could have a serious misconception by Ms. Brandon about what the law forbade. We have an informal complaint. Indeed, it's like one line that says, I hired her because she was qualified. And the law may say that that's enough to be an opposition to illegal conduct or reasonably perceived illegal. We do not have any action actually taken against her because it was threatened in the same context in which Ms. Campanion said, I have to talk to the president, and she quit before that was ever, anything ever happened. And because she quit, we have a seriously limited amount of damages. So here are all these different leaps that you have to go through and say that the company may have to pay damages because of, you know, a perceived violation, a very informal complaint, no action actually taken, and so on. I mean, put together, that seems to me a pretty broad, pretty broad potential scope for the statute. Sure, and if I may briefly address the facts, and then I think I can provide a legal limiting principle here. With regard to the facts, Ms. Brandon defended not only the hiring, but also I think under the circumstances, one could question the ongoing viability of Mr. Urey's stature within the company. And indeed, those issues were directly linked because shortly thereafter, Ms. Campanion threatened to reduce and was, did in fact reduce Mr. Urey's hours on the project. She calls herself Ms. Urey, and the district judge said she referred to herself as Ms. Urey. I believe that, okay, fair enough. But beyond just complaining about the fact that the pay raise was unfair, I'll direct your attention to page 618 in the record, and there, for example, Ms. Brandon makes clear to Ms. Campanion that Mr. Urey was qualified, and that it would have violated the law for them not to hire Mr. Urey. It was framed in terms of there would be a lawsuit if we didn't hire him. So I think that's sufficient conduct, certainly under the Supreme Court standard in Crawford, to get protected opposition. I appreciate your concern, Judge Jones. There are, these are broad tests. There is a broad test of what constitutes retaliatory conduct under Burlington Northern, and there is a broad test in the Supreme Court's decision in Crawford as to what constitutes protected opposition. It's quite passive in that case. I think the limiting principle here is causation. In most cases, there's very indirect evidence of causation. For example, I complain to the EEOC, a month later, somebody knocks my pay down. I'm proceeding under the traditional McDonnell-Douglas test. The employer comes forth with evidence that there were all kinds of problems with my performance, justifying the pay reduction, and the case is dismissed on summary judgment. Here, there is direct evidence of a retaliatory motive. The alleged retaliator makes clear that she is essentially trying to stop protected activity before it starts. And I think that gives comfort to this panel in these kind of cases, because in a traditional case where there is not direct evidence of causation, there's a far greater likelihood that the employer will be able to move for summary judgment and not go to trial. But when you have direct evidence, and again, far be it for me to presume what was motivating the panel's decision in the Fallon case, but I think there, because you have direct evidence of a retaliatory animus, I think that that case appropriately goes to a jury. And under the standard in Burlington Northern, this Court, and again, these are in unpublished decisions, but they're quoting to a standard that the Eleventh Circuit issued in a published decision, it is for the jury to decide whether or not anything more than the most petty and trivial actions against an employee should be considered materially adverse under the Burlington Northern standard. The company raises one other issue, and that is what authority Ms. Campanion may have had to cut pay. I mean, clearly she didn't alone. She had to have the President's approval. Well, I don't know if that's exactly clear from the record. I think that, and I may have to address this issue again on a rebuttal, but I think here factually, if you credit Ms. Campanion's own version of what happened, she dictated the schedule for the Sand Gel project, criticized Ms. Brandon's alleged over-reliance on her administrative assistant, and was in the process of securing a new director for the school, and that can be seen at pages 245 and 246 of the record. So under her own version of what happened, the fact that she was the national project director for the Sand Gel project meant that she had free-roving national authority. Well, except for the fact she was only in San Antonio for three days. Sure, but I don't – Based in Billings, Montana. I mean, I just – I haven't looked at the whole record, but it just didn't make much sense to me that all of a sudden she could swoop in from out of town for a three-day project and then basically threaten Brandon and fire Urey and do all that other stuff. I mean, you know, the women – so the women walked off the job before they decided to protect their rights within the corporate structure. Well, again, there's no – and I want to be respectful of the red light, if I may briefly. Answer, yes, sure. There's no requirement here that the employees avail themselves of any kind of structure. That is a situation that exists as an affirmative defense for a hostile work environment case. Well, this is not a hostile work environment case because it wasn't pervasive. That's correct, and the distinction here, if I may, is that in a hostile work environment case, the standard is more onerous because the employee is not acting within their scope of their employment when they are engaging in harassing behavior. Here, everything that Ms. Companion did was both within the scope of her employment and to benefit her employer. Well, you're asserting that, and there may be a tribal issue about it, but that's only an assertion at this point, it seems to me. I think that there are facts for a tribal issue, yes. Did these ladies – is there any evidence in the record about whether these ladies consulted with counsel before they walked off the job? There's no evidence in the record on that, Your Honor. There is evidence in the record that I'll point you to briefly on pages 496 and 499 of the record, and in addition, 513, that Ms. Brandon and Mr. Urey attempted to call the president of the company before they left the job. Excuse me, it was Ms. Brandon. She tried calling her immediate supervisor, Barbara Brake, and she also tried calling the president. If there are no further questions, I can address the remainder during rebuttal. Okay. Thank you, Your Honor. Thank you. Wait, EEOC had gone. Ms. King. May it please the Court and King on behalf of Amicus Equal Employment Opportunity Commission. The commission's brief covered three primary issues, Brandon's reasonable belief, Brandon's protected activity, and the district court's conclusion that Brandon could not establish a materially adverse action. I'd like to add one point on the materially adverse action issue, although Counsel for Brandon already covered that quite fully. That's the district court's suggestion that a threatened pay reduction cannot constitute a materially adverse action, and I'd like to underscore that a categorical rule of that type is not consistent with the Burlington Northern Standard, which holds that a materially adverse action in a retaliation claim is one that might well dissuade a reasonable worker from engaging in protected activity. And here, again, as Counsel emphasized, if companion statement was characterized as a threat, a jury could deem it a threat that was both credible and significant. Significant because Brandon faced losing half her salary, and credible because of companion's stature at the company, and because of her role in the Sangel project, which was the purpose of her visit to the San Antonio school. Second, I'd like to discuss Brandon's reasonable belief. Under the retaliation clause, an individual who opposes unlawful activity under Title VII must only show that she has a reasonable belief that the opposed conduct violated Title VII. And in this case, the key precedent is the Price-Waterhouse decision, which explained that Title VII's prohibition on sex discrimination also encompasses gender discrimination, that gender must be irrelevant to employment decisions. And accordingly, Price-Waterhouse and many courts following that decision have stood for the proposition that disparate treatment based on gender stereotyping may constitute gender discrimination under Title VII. Well, but cases have held that discrimination on the basis of transgender, whatever you call it, there have been some cases that have so held. Circuit court. That's correct. Most recently, the Tenth Circuit in its city made that determination in terms of per se discrimination. The other circuit court decisions reaching that conclusion, however, predate Price-Waterhouse. But I'd also like to add that I don't think that this court needs to reach that particular question because the commission agrees with the district court in its conclusion that Brandon could show that she has a reasonable belief because one basis for showing sex discrimination is a gender stereotyping theory. And that's all I think is necessary in this case, particularly because Brandon need only show a reasonable belief, not that there was actual violation of Title VII. What is there in the facts of this case that indicates gender stereotyping? A few details, Your Honor. I think the most important fact is Uri's appearance. So Brandon's opposition was in reaction to Companion's expression that she, Companion, didn't think Uri should be allowed to work at SAGE. Uri. We've known her across genders. That's correct. That more than once, actually. That's correct, Your Honor. So Companion specifically invoked gender, and so that's one piece of evidence.  Suppose Uri was out there on the trucking, and instead of dressing like a man, she dressed like Dolly Parton and Companion, and said, we don't hire people like that. Would that be gender stereotyping, too? That's a good question, Your Honor. It's possible that it may be gender stereotyping if, for example, I know that Dolly Parton tends to dress in a traditionally feminine manner. If Companion meant to express that an overly feminine woman wouldn't be qualified to work in a truck driving school. So who's supposed to decide what is discrimination on the basis of sex and what's discrimination on the basis of bad taste and bad, you know, just personal insult? Well, the district court has a gatekeeping function there, certainly. But we think that here there's enough for that question to go to a jury. Again, I emphasize, and I see that my time's up, but I can finish responding to that question, that Brandon need only show she has a reasonable belief. And Companion's invocation of gender and Uri's appearance, although known as Loretta at the time, in a masculine way is much like Ann Hawkins in the Price Waterhouse case. Okay. Further questions? Thank you. Okay, Mr. Hawkins. May I please? Why didn't you ask for the cases to be consolidated for hearing? Judge, I should have, evidently. I assumed that was a conscious decision that the court had made, and I was surprised by it, but I assumed that it was. Well, it does create a lot of, I mean, we may have to do something about it internally. We'll just have to see. So if all of you are acknowledging that they should have been consolidated, maybe the court will do something sua sponte. I don't know. No, I was quite surprised by it and perhaps should have taken an exercise to follow up that further, but we just assumed that the court knew what it wanted to do. Apparently everybody said it was a related case, huh? Yes, correct. Okay. Thank you. Your Honors, we believe that this case can be settled by well-established law and not have to go into new law or even the edges of the law. That we think, in this case, there are three issues really that, in addition to the multiple ones that the court has mentioned, that establish why the summary judgment in this case in retaliation was appropriate. Number one, waiver. There were a bunch of cases, causes of action, alleged by the plaintiff here. Summary judgment was granted on all of them. The only one that was even appealed is the retaliation. And in the retaliation claim, our perception is the plaintiff looked at that and said, you know, our claim about just this 50% alleged threat in reduction in pay is pretty weak. It did the same analysis that the judge did earlier. That's pretty weak. So we'll try to supplement that by alleging that she was also excluded from the Sandjaw Project. Unfortunately, that exclusion is not mentioned in the plaintiff's petition or in plaintiff's response to the motion for summary judgment. So to the extent that had any validity, that issue has been waived. And there are cases that clearly set forth that. Henderson v. Yellow Transport, where they said one type of retaliation and investigation was not mentioned in connection with the retaliation claim. And the court said it's inappropriate to look at that. Also, the Jackson case, Jackson v. CalWestern Packaging, the evidence was not identified by the plaintiff in response to the motion for summary judgment. The court said we can't consider that. In this case, it's well-established law, Malacara, where evidence exists in the summary judgment record, but the non-movement fails to even refer to it in the response for summary judgment. That evidence is not properly before the district court. So we believe that Mr. Brandon has waived any claim to use the exclusion in the Sandjaw Project as evidence in this case. We think the general rule is, which is established by a number of cases, is that unpleasant comments, whether in the form of a review or a threat to pay for 50 cents, 50 percent, are not considered mature lit adverse events. And you look at the cases we've cited, the Stewart v. Mississippi Transportation case goes into numerous actions against the plaintiff and held that that was not a mature lit adverse event. The same thing on a number of cases. For purposes of retaliation? Was that a retaliation case? Yes. Yes, Judge, that was a retaliation case. The lady was placed. Stewart was a retaliation case? Which one are you talking about? Stewart v. Mississippi Transportation, yes. In that case, the allegations of retaliation were essentially five. She was placed on administrative leave for three weeks. She was reassigned to a new supervisor and given a heavier workload. Personal items were taken from her desk. Locks in her office were changed. She was not allowed to close the door. And she was chastised by superiors and ostracized by coworkers. And the Court says as a matter of law, the third, fourth, and fifth ones were not adverse events. And it said it was. And then they looked at this administrative leave was not a material adverse event because it had no continuing effect on the person. She wasn't. She was paid. And it didn't impact her future with the company. So you're using that to argue that the threat of a cut in pay of 50 percent is incidental to somebody's workplace? I don't know if that quite follows from the sort of more minor matters that we were dealing with in Stewart and some of your other precedents. I think there are a number of cases in addition to Stewart that deal with micromanaging, deal with criticism, deal with employment reviews. Let me ask if she actually had her pay cut in half effectively before she left, that would be a substantial adverse impact on her, correct? If, in fact, her pay was cut 50 percent. Are you just saying that the threat itself fits within these? If it's only a threat, it fits within these cases you're talking about? I think the threat here has very little value, and there are several reasons for that. Number one, the threat is made by somebody who's not her supervisor, who's made by somebody who's in town for three days. But the impression, at least at the time of summary judgment, is that this is one of the big dogs come down from on high who's unclear at this stage of the case just who she is and how she—her actual authority. It seems to me that the ambiguity of her situation makes the threat in a way more credible to Brandon. She's not quite sure who she's dealing with, but the company is allowing her to throw a weight around. Well, I think a couple of things in that connection, Judge. Number one, it is consistent in the discussions between Ms. Brandon and Ms. Companion that Ms. Companion several times notes, I'm going to have to check with Mr. Aversa. I'm going to have to check with Mr. Aversa. Even later in the deposition, Brandon talks about her discussions with Yuri that I know Companion has said some things, but we're going to check with Mr. Aversa, the president, and see what the story is. So it's clear that they understand at that time that Ms. Companion doesn't have that authority. Ms. Companion had never been involved in hiring, supervising, giving a pay raise, or having any other activity with Ms. Brandon other than this visit for two days where she quit before the third day ever occurred. My understanding of your brief is that insofar as the Sand Jail Project, if I have the name right, your argument is there's no evidence to support that Brandon would have known of any change in her role on Sand Jail until after she quit. There's no evidence in the record to show that she would have known when she quit that her role in Sand Jail had changed. Is that your position? First of all, I'd say that issue has been totally weighed by the plaintiff by failing to assert it in the trial court. My second point on that would be the only evidence in all of that is some discussion of the possibility of that in an affidavit of Ms. Companion that comes in the trial court material. But there is no dispute in the evidence that Mr. Iversa was the president, that Barbara Blake was the supervisor of Mr. Brandon, and that Companion was neither the person that hired, supervised, trained, or had control of the San Antonio office. She was, you know, in the Montana office and came to San Antonio for three days and that was her limited authority. Now, and again, that threat is minimized by the status of Ms. Companion. And one of the cases I'd like to cite to the court on that, which is an unpublished opinion, Spencer v. Smith, 576 Fed Appendix 442. And that case involves some foremen who, a quite recent case and the judge is familiar with, who not only cussed an individual, but also kind of cornered him in a room. And the court in that case made it clear there's a big distinction between who's doing this and are they doing it on behalf of the employer. In that case, they help with these foremen who had some ability to direct the day-to-day operations and the tasks that these people performed, but did not have the right to hire and fire them. And I think that's very comparable here. Ms. Companion had the right to come in and say, can you help us do this or that or something on this particular project, but did not have the ability to hire, fire, or lower the pay of Ms. Brandon. My understanding is, too, and I haven't, I saw the Ms. I gather that the only evidence we have about Ms. Companion is her declaration or affidavit that's in the trial court record. Was she deposed? She was not deposed. She has an affidavit in there. Mr. Aversa has an affidavit in there. Barbara Blake has an affidavit in there, all of which consistently say that she did not have the authority to hire, fire, or lower the pay of anybody. Well, is there a legitimate fact issue about that insofar as I read something in the briefs to say that she felt it was her role to counsel Brandon? And it had to do partly with safety, the truck safety, and I forget what other, something about her management style or something like that. Well, I think she has some right to comment or interact with her on a limited basis, much as the foreman did in the Spencer v. Smith case. But she did not have the right to hire, fire, change the terms of her employment, or do anything like that. And that is not disputed. That's her testimony in her affidavit. That is everybody else involved in the company. Nobody has said that Ms. Companion had the right to do that or to even have input into that. She had never had input in any decision prior to this regarding Ms. Brandon. And perhaps she could have had after this, but she was not a decision maker or a supervisor in connection with this case. Did you put this point to Judge Ezra? Because he didn't write on that question at all about her authority. I think we had that well identified in the brief. Well, they didn't say you had waived it, but I was just surprised because he's usually pretty thorough. Judge Ezra is very thorough. I think he reached a conclusion based on the issues that we had, and he didn't have to get into several other issues, which we also briefed in the district court. Thank you. Another case that is interesting in this threat issue is the Smith v. Harvey case, which is, again, an unpublished case, 265 Fed Appendix 197. In that case, a person who was not the plaintiff's direct supervisor made a comment that something bad is going to happen to Smith. And in analyzing that comment and whether that was part of a package of a material adverse event, the court said, we take into account the status of that person who was not the direct supervisor of the person who was being threatened with that. And so, likewise, we believe it's appropriate here for the court to take into account Ms. Companion's status, the fact that she was there for three days and that she did not have control of this. As a matter of fact, had the people stayed until Monday, as the evidence clearly shows, there's no dispute about this, both Ms. Urie and Ms. Brandon were invited to continue on without any adverse effect. So that had they simply stayed there, we would have a record that showed nothing happened to Ms. Brandon or Ms. Urie. But simply they left themselves. And one of the things that they don't appeal from the summary judgment is that they weren't constructively discharged. So it's clear that they understand that they were not treated sufficiently, that they needed to leave. They just chose to leave. But we continue to assert all of the grounds that we've set forth in our brief. We believe that the waiver argument applies to this exclusion from Sangell. We believe that, in this case, the continued pattern of cases of comments are just not enough to be materially adverse events. And the number of cases that this court has considered . . . Aren't you just repeating yourself now? Well, I am, Judge. I'm going to give you about three more cases and then I'm going to sit down, if that's all right. That's fine. I just want to be sure you weren't just summarizing to use the rest of your time. No, no, no. I think the Earl v. Aramark Corp. case, 247 Fed Appendix 519, their disciplinary write-up and micromanaging was held not sufficient to be a materially adverse event. The Mendoza v. Bell Helicopter case, three verbal counselings for taking too long on assignments and for riding on an electric buggy held not to be enough to be a materially adverse event. And that was 485 Fed Appendix 127. Brown v. Liberty Mutual. Brown was told to improve her sales performance and threatened with taking away her sales associate. That's 215 U.S. . . . Is there any evidence about how Brandon would have . . . how they would have cut her pay in half? There is no evidence. I mean, was she somebody who was working sort of on an hourly basis? She was a supervisor, right? She was a supervisor on a salary, yes. I think, yes, she was a supervisor on a salary. I don't know how it would have possibly cut her salary in half. Yeah, I don't know how you could take that seriously if they're the supervisor, because then you're probably getting paid less than your assistant at that point. Particularly, her supervisors had given her a raise within recent months. There was no reason to think that her supervisor, her direct supervisor, or Mr. Aversa, the president, who she communicated with and had knowledge of and who she acknowledged. When Uri says, should I do something now? She says to Uri, no, no, wait until I talk to Aversa, because she understood that Companion was not in control and that Mr. Aversa was the man that had the authority to deal both with Ms. Uri, who was just a regular employee and instructor, and to deal with her situation, who was at a much higher level, the manager of that location. Is there any suggestion that you know of that they quit on the advice of counsel?  The only other case I'll mention is Johnson v. McDonald, 215 U.S. App, Lexus, 15, 156, August 25th case. There, a person alleged they were given a low performance rating, but didn't show how that translated into any kind of quantitative effect on them, and the court said that summary judgment on the retaliation was appropriate, and we believe the same thing happens here. Summary judgment was appropriate because there was no acting that ever happened, and just casual comments or even threatened comments or harsh language, cussing, have not been held sufficient to constitute a material adverse event. Thank you. Thank you. Okay, Mr. Smith. I'll actually correct the time. I believe I only have three minutes. Oh, there it is. Thank you. That was very generous. You've been very generous with your time here today. I'd like to start by emphasizing that this is not a constructive discharge case, and the standards that apply to a constructive discharge case. You guys didn't hang around long enough to be constructively discharged. Sure, and we acknowledge that by not appealing that. But the standard here is whether or not the threat might have dissuaded a reasonable employee from engaging in further protected activity. I think under the standard that the Supreme Court announced in Burlington Northern, that question is for a jury to decide in this case. I think, as Judge Smith said, Ms. Campagna was a big dog that came down, and a reasonable employee in the circumstances of Ms. Brandon could have well been fearful that continued engaging in protected conduct was going to cost her significantly with respect to her pay or her job. Part of your brief argues, I think, I may have the wrong brief, that her pay, one comment to her, to Brandon, is their pay actually was cut in half, which to me in a way makes the case weaker almost. What it seems to me you need is that a reasonable employee would change her conduct because of the threat. I think that's right. But if the pay is actually cut in half, and in fact here there's no evidence that it actually was, it seems to me that's a different matter. It could be, and I don't think we have to get into whether or not the decision was made. It's the fact that it was conveyed by an employee of significant authority, and it was a credible threat under the standard announced in Burlington Northern. I also think from a policy perspective it goes without saying that if threats are per se non-actionable, you've essentially promoted them for employers. Make a threat. If it's successful, you've dissuaded protected conduct. If it's not, no liability for retaliation. That's a dangerous threat. It doesn't matter who makes the threat. If you're in the accounting department and it's somebody in the manufacturing department that says, I don't like the way you did that, we're going to do something about it, then that's a threat even though it's totally outside the chain of command in the company. In Burlington Northern the court said that it had to be something that would dissuade a reasonable employee. I think in the totality. I know that, but that doesn't mean anything. It can't mean anything. Otherwise, you know, anybody who pops off, and there are plenty of people who pop off in the workplace, can subject a company to liability, and the law isn't an ass. It has to be, there has to be some standard of credibility for the threat. Sure, and here this isn't just any employee. And if I could briefly address. Well, there's at very most a fact issue on that. And I agree with you, and your decision in Atkel says that it's a factual question as to whether or not somebody of miscompanioned stature is in fact exercising authority on behalf of the company. If there are no further questions, we respectfully ask that you reverse the judgment of the district court. Thank you. All righty. Thank you very much.